[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 19-14434

_____

RICHARD HUNSTEIN,

Plaintiff-Appellant,

*versus*

PREFERRED COLLECTION AND MANAGEMENT SERVICES,
INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:19-cv-00983-TPB-TGW

_____

Before JORDAN, NEWSOM, and TJOFLAT, Circuit Judges.

NEWSOM, Circuit Judge:

Upon consideration of the petition for rehearing, the amicus curiae briefs submitted in support of that petition, and the Supreme Court's intervening decision in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), which bears on one of the issues presented in the case, the Court sua sponte VACATES its prior opinion, published at 994 F.3d 1341 (11th Cir. 2021), and substitutes the following in its place.

\*   \*   \*

This appeal presents an interesting question of first impression under the Fair Debt Collection Practices Act—and, like so many other cases arising under federal statutes these days, requires us first to consider whether our plaintiff has Article III standing.

Here's the short story, as described in the complaint, whose allegations we must accept as true for present purposes: A debt collector electronically transmitted "sensitive medical information" concerning a consumer's debt—including not only his name and outstanding balance, but also the fact that his debt resulted from his minor son's medical treatment, as well as his son's name—to a third-party vendor. The vendor then used the data to create, print, and mail a "dunning" letter to the consumer. The consumer filed suit alleging that, in sending his personal

information to the vendor—and in particular, the complaint says, to the vendor's "employees"—the debt collector had violated 15 U.S.C. § 1692c(b), which, with certain exceptions, prohibits debt collectors from communicating consumers' personal information to third parties "in connection with the collection of any debt." The district court rejected the consumer's reading of § 1692c(b) and dismissed his suit.  On appeal, we must consider, as a threshold matter, whether the consumer has adequately alleged that the debt collector's violation of § 1692c(b) caused him to suffer a concrete injury in fact under Article III, and, on the merits, whether the debt collector's communication with its dunning vendor was "in connection with the collection of any debt."

We hold (1) that the violation of § 1692c(b) alleged in this case gives rise to a concrete injury in fact under Article III, and (2) that the debt collector's transmittal of the consumer's personal information to its dunning vendor constituted a communication "in connection with the collection of any debt" within the meaning of § 1692c(b).  Accordingly, we reverse the judgment of the district court and remand for further proceedings.

# I

Congress enacted the FDCPA "to eliminate abusive debt collection practices by debt collectors" and "to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e).  To that end, § 1692c(b) of the FDCPA, titled "Communication with third parties," provides that—

> Except as provided in section 1692b of this title, with-
> out the prior consent of the consumer given directly
> to the debt collector, or the express permission of a
> court of competent jurisdiction, or as reasonably nec-
> essary to effectuate a postjudgment judicial remedy,
> a debt collector may not communicate, in connection
> with the collection of any debt, with any person other
> than the consumer, his attorney, a consumer report-
> ing agency if otherwise permitted by law, the credi-
> tor, the attorney of the creditor, or the attorney of the
> debt collector.

15 U.S.C. § 1692c(b).  The provision that § 1692c(b) cross-refer-
ences—§ 1692b—governs the manner in which a debt collector
may communicate "with any person other than the consumer for
the purpose of acquiring location information."  15 U.S.C. § 1692b.
The FDCPA thus broadly prohibits a debt collector from com-
municating with anyone other than the consumer "in connection
with the collection of any debt," subject to several carefully crafted
exceptions—some enumerated in § 1692c(b), and others in § 1692b.

The facts, according to the complaint, are these:  Richard
Hunstein incurred a debt to Johns Hopkins All Children's Hospital
arising out of his minor son's medical treatment.  The hospital as-
signed the debt to Preferred Collections & Management Services,
Inc. for collection.  Preferred in turn hired CompuMail Information
Services, Inc., a California-based commercial mail vendor, to han-
dle the collection.  Preferred electronically transmitted to Compu-
Mail "sensitive medical information" about Hunstein—including,

for instance, not only (1) his status as a debtor and (2) the exact balance of his debt and the entity to which it was owed, but also (3) that the debt concerned his son's medical treatment and (4) his son's name.  CompuMail used that information to generate and send a dunning letter to Hunstein.

Hunstein filed a complaint, asserting violations of both the FDCPA, *see* 15 U.S.C. §§ 1692c(b), 1692f, and the Florida Consumer Collection Practices Act, *see* Fla. Stat. § 559.72(5).  As relevant here, Hunstein alleged that Preferred violated the FDCPA "when it disclosed information about his purported . . . debt to the employees of an unauthorized third-party mail house."  The district court dismissed Hunstein's action for failure to state a claim, concluding that he hadn't sufficiently alleged that Preferred's transmittal to CompuMail violated § 1692c(b) because it didn't qualify as a communication "in connection with the collection of a[ny] debt."[1]

Hunstein appealed, and we requested supplemental briefing on the question whether he had Article III standing to sue, which we now consider along with the merits.[2]

---

[1] The district court held for the same reason that Hunstein had not stated a claim for a violation of § 1692f.  The district court then declined to accept supplemental jurisdiction over Hunstein's state-law claim.  Hunstein's appeal addresses only the portion of his complaint relating to § 1692c(b).

[2] Whether Hunstein has standing is a threshold jurisdictional question that we review de novo.  *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1083 (11th Cir. 2019).  We also "review the decision to dismiss Plaintiff's complaint

## II

First things first.  Because standing implicates our subject matter jurisdiction, we must address it at the outset, before turning to the merits.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998).  Article III of the Constitution grants federal courts "judicial Power" to resolve "Cases" and "Controversies."  U.S. Const. art. III, §§ 1–2.  This case-or-controversy requirement, which has been construed to embody the doctrine of standing, "confines the federal courts to a properly judicial role."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  The "irreducible constitutional minimum" of Article III standing entails three elements: injury in fact, causation, and redressability.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

Hunstein's appeal involves the first element, injury in fact, which consists of "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Id.* at 560 (quotation marks omitted).  In *Trichell v. Midland Credit Management, Inc.*, 964 F.3d 990 (11th Cir. 2020), a case involving the FDCPA, we reiterated that "[e]ach

---

pursuant to Rule 12(b)(6) de novo, applying the same standard as the district court."  *Holzman v. Malcolm S. Gerald & Assocs., Inc.*, 920 F.3d 1264, 1268 (11th Cir. 2019).  Accepting the complaint's allegations as true and construing the facts in the light most favorable to Hunstein, "the relevant inquiry is whether Plaintiff has stated a 'plausible claim for relief' under the FDCPA."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

subsidiary element of injury—a legally protected interest, concreteness, particularization, and imminence—must be satisfied." *Id.* at 996–97. The standing question here implicates the concreteness sub-element.

A plaintiff can meet the concreteness requirement in any of three ways. First, he can allege a tangible harm—a category that is "the most obvious and easiest to understand" and that includes, among other things, physical injury, financial loss, and emotional distress. *See Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 926 (11th Cir. 2020) (en banc); *see also Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 463 (6th Cir. 2019). Second, a plaintiff can allege a "risk of real harm." *Muransky*, 979 F.3d at 927. Third, in the absence of a tangible injury or a risk of real harm, a plaintiff can allege an intangible-but-nonetheless-concrete injury, including one resulting from a statutory violation. *Spokeo*, 578 U.S. at 340. We consider each possibility in turn.

## A

In a supplemental brief, Hunstein concedes that his "injury is not tangible." Supp. Br. of Appellant at 10. To be sure, his complaint (1) conclusorily asserts that "[i]f a debt collector 'conveys information regarding the debt to a third party—informs the third party that the debt exists or provides information about the details of the debt—then the debtor may well be harmed by the spread of this information,'" and (2) vaguely references the "known, negative effect that disclosing sensitive medical information to an

unauthorized third-party has on consumers." And on a (very) charitable reading, those statements *might* be construed to allege emotional harm, which some courts have counted as a tangible injury for Article III purposes. *See Huff*, 923 F.3d at 463. Regardless, because Hunstein has expressly disclaimed it, and because, as we explain in detail below, he has alleged a different kind of concrete injury sufficient to establish standing, we needn't decide whether he has sufficiently alleged a tangible emotional harm.

## B

Hunstein can't demonstrate a "risk of real harm." "[W]hile very nearly any level of direct injury is sufficient to show a concrete harm, the risk-of-harm analysis entails a more demanding standard—courts are charged with considering the magnitude of the risk." *Muransky*, 979 F.3d at 927. "Factual allegations that establish a risk that is substantial, significant, or poses a realistic danger will clear this bar . . . ." *Id.* at 933. Put slightly differently, to constitute injury in fact, the "threatened injury must be certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Again, Hunstein alleges only that a debtor "may well be harmed by the spread" of the sort of information at issue here. That vague allegation falls short of a risk that is "substantial, significant, or poses a realistic danger," *Muransky*, 979 F.3d at 933, or is "certainly impending," *Clapper*, 568 U.S. at 409.

## C

We thus consider whether Hunstein can show standing in the third manner—through an intangible injury resulting from a statutory violation. "[T]he violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact," such that "a plaintiff . . . need not allege any *additional* harm beyond the one Congress has identified." *Spokeo*, 578 U.S. at 342 (emphasis in original). *Spokeo* instructs that in determining whether an alleged statutory violation confers Article III standing, we should consider "[1] history and [2] the judgment of Congress." *Id.*

### 1

Starting with history, we can discern a concrete injury where—in the words of *TransUnion*, echoing *Spokeo*—"the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 141 S. Ct. at 2200 (quoting *Spokeo*, 578 U.S. at 341). Put differently, we look to "whether the statutory violation at issue led to a type of harm that has historically been recognized as actionable." *Muransky*, 979 F.3d at 926. In particular—more on this shortly—our en banc opinion in *Muransky* explains that the fit between a plaintiff's statutory claim and "a pedigreed common-law cause of action need not be perfect, but we are called to consider at a minimum whether the harms match up between the two." *Id.*

**a**

For more than a century, invasions of personal privacy have been regarded as a valid basis for tort suits in American courts. *See, e.g.*, *Pavesich v. New England Life Ins. Co.*, 122 Ga. 190, 50 S.E. 68, 73 (1905); *Munden v. Harris*, 153 Mo. App. 652, 134 S.W. 1076, 1079 (1911); *Kunz v. Allen*, 102 Kan. 883, 172 P. 532, 532–33 (1918). By 1977, the Restatement (Second) of Torts reported that "the existence of a right of privacy is now recognized in the great majority of the American jurisdictions that have considered the question." Restatement (Second) of Torts § 652A cmt. a. (Am. Law Inst. 1977). It is altogether unsurprising, then, that in reiterating *Spokeo*'s holding that "intangible harms can . . . be concrete," the Supreme Court in *TransUnion* pointed to a handful of privacy-related torts: "reputational harms, disclosure of private facts, and intrusion upon seclusion." 141 S. Ct. at 2204.

As *TransUnion*'s summary suggests, the term "invasion of privacy" comprises an identifiable family of common-law torts—including, most relevantly here, one of the Supreme Court's own exemplars: "public disclosure of private facts." *Invasion of Privacy*, Black's Law Dictionary 952 (10th ed. 2014). It is hornbook law that "[o]ne who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." Restatement (Second) of Torts § 652D (1977); *accord, e.g.*, 77 C.J.S. Right of Privacy and Publicity § 32; 62A Am.

Jur. 2d Privacy § 79.  Indeed, the Supreme Court itself has recognized "the individual interest in avoiding disclosure of personal matters" and that "both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person."  *Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989) (citation and quotation marks omitted).

Having established the historical pedigree of invasion-of-privacy torts—in particular, the sub-species applicable to the public disclosure of private facts—we next consider whether Preferred's alleged statutory violation is sufficiently analogous.  For the reasons that follow, and having considered the Supreme Court's recent decision in *TransUnion*, we hold that it is.

We begin with a bedrock truth, which both the Supreme Court and this Court have stated and restated (and restated):  Article III does *not* require an exact match between a statutory claim and a common-law cause of action.  In *Spokeo* itself, the Supreme Court required only a "close relationship" between the two.  *See* 578 U.S. at 341.  On remand from—and taking direction from—the Supreme Court, the Ninth Circuit in *Spokeo* emphasized that the Court had "observed that it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit, *not that Congress may recognize a de facto intangible harm only when its statute exactly tracks the common law*."  *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1115 (9th Cir. 2017) (quotation marks omitted;

emphasis added and omitted)).  Sitting en banc in *Muransky*, we similarly emphasized (as already noted) that the fit between a plaintiff's statutory claim and "a pedigreed common-law cause of action need not be perfect."  979 F.3d at 926.  And most recently, the Supreme Court underscored the point in *TransUnion*:  "In looking to whether a plaintiff's asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts, we do not require an exact duplicate."  141 S. Ct. at 2204 (quoting *Spokeo*, 578 U.S. at 341).[3]

But the question remains:  If (as we now know for certain from *TransUnion*) Article III doesn't require a precise fit between an alleged intangible harm and a common-law tort, what *does* it require?  The Supreme Court has never squarely answered that question, but lower-court decisions—both our sister circuits' and our own—offer useful guidance.  Courts considering the question have concluded that under *Spokeo*—and in two more recent instances, under *TransUnion*—a plaintiff need only show that his alleged injury is similar in *kind* to the harm addressed by a common-law cause of action, not that it is similar in *degree*.  For reasons we

---

[3] Of course, if Article III required a perfect match between an alleged harm and a common-law tort, Congress could only replicate and codify *existing* common-law causes of action—it would have *no* power to create enforceable rights.  That is not, and couldn't be, the law.  *See Spokeo*, 578 U.S. at 341 (acknowledging "Congress' role in identifying and elevating intangible harms").

will explain, under this sensible and uncontroversial approach, Hunstein has standing here.

First, though, the "kind, not degree" cases. We begin our survey with Judge O'Scannlain's opinion for the Ninth Circuit on remand from the Supreme Court in *Spokeo*. Importantly for our purposes, he explained there that *Spokeo*'s "close relationship" test requires that an intangible harm be "at least closely similar *in kind* to others that have traditionally served as the basis for lawsuit." *Robins*, 867 F.3d at 1115 (emphasis added). The Ninth Circuit thus held that although the Fair Credit Reporting Act's cause of action differed in key respects from the common-law torts of defamation and libel—both of which, for instance, require that any disclosure of false information be harmful to one's reputation—the statute's cause of action bore a sufficiently "close relationship" for Article III purposes. *Id.*

Now-Justice Barrett's opinion for the Seventh Circuit in *Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458 (7th Cir. 2020)—which, notably, the Supreme Court cited with approval in *TransUnion*—is similar, if even more explicit. In holding there that a plaintiff's allegation that he had received several unwanted text messages in violation of the Telephone Consumer Protection Act constituted a concrete injury for Article III purposes, the court emphasized—just as Judge O'Scannlain had—that "when *Spokeo* instructs us to analogize to harms recognized by the common law, we are meant to look for a 'close relationship' in *kind, not degree.*" *Id.* at 462 (emphasis added). In particular, the Seventh Circuit held

that the harm resulting from the unwelcome text messages bore a sufficient relationship to the tort of intrusion upon seclusion, even though it recognized that "[a] few unwanted automated text messages may be too minor an annoyance to be actionable at common law." *Id.* at 463.   The key point, the court emphasized, was that "such texts nevertheless pose the same *kind* of harm that common-law courts recognize." *Id.* (emphasis added).

Other courts have decided standing cases in the wake of *Spokeo* in the same basic manner.   For instance, in holding that a single unsolicited text message in violation of the TCPA bore a close relationship to the common-law tort of public nuisance, the Fifth Circuit—in an opinion by Judge Oldham—freely acknowledged that the statute didn't duplicate the common-law tort in every jot and tittle.   *See Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 690 (5th Cir. 2021).   In particular, the court held that although the harm alleged didn't "interfere with those who come in contact with it in the exercise of a public right or . . . otherwise affect[] the interests of the community at large"—as is required for public-nuisance claims, *see* Restatement (Second) of Torts § 821B cmt. g (1979)—the plaintiff's allegations had "enough" of a relationship to the common-law tort, 998 F.3d at 692.   In so holding, the Fifth Circuit emphasized that a court's concreteness inquiry should be "focused on types of harms protected at common law, not the precise point at which those harms become actionable." *Id.* at 693 (quoting *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019)).

In just the same way, the Eighth Circuit has held that the harm identified by § 1692f(1) of the FDCPA—which prohibits debt collectors' attempts to collect amounts not actually owed—bears a sufficiently close relationship to common law "unjustifiable-litigation torts," including the tort of malicious prosecution. *Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 691 (8th Cir. 2017). Importantly here, it did so notwithstanding the fact that an attempt to collect a debt not owed differs from malicious prosecution in several critical respects—perhaps most notably, that it doesn't even involve the invocation of judicial power. *See id.*

Likewise, in *In re Horizon Healthcare Services Inc. Data Breach Litigation*, 846 F.3d 625 (3d Cir. 2017), the Third Circuit determined that violations of certain provisions of the FCRA governing credit-card companies' dissemination of personal information bore a close relationship to invasion-of-privacy torts. In doing so, the court acknowledged that although neither the provisions in the FCRA nor the plaintiff's allegations involved the dissemination of information that was damaging to one's reputation or otherwise offensive—which, as already explained, privacy torts ordinarily require—the harms nonetheless satisfied *Spokeo*'s close-relationship test. *See id.* at 639 (noting that "[w]e are not suggesting that Horizon's actions would give rise to a cause of action under common law").

Most recently—and in fact, since the Supreme Court's *TransUnion* decision—the Tenth Circuit held in *Lupia v. Medicredit, Inc.* that the harm resulting from a single phone call bore a

close relationship to the tort of intrusion upon seclusion. *See* 8 F.4th 1184, 1191 (10th Cir. 2021). The court there emphasized that "[t]hough a single phone call may not intrude to the degree required at common law, that phone call poses the same *kind* of harm recognized at common law." *Id.* at 1192 (emphasis in original). In so holding, the Tenth Circuit distinguished *TransUnion*; it emphasized that the *TransUnion* defendants hadn't published tortious words and, accordingly, that the harm identified by the plaintiffs there "differed in kind" from the harm of defamation. *Id.*[4]

This Court's lone foray into the "kind"-"degree" waters—while not perfectly free of ambiguity—is consistent with our sister circuits' decisions. In *Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir.

---

[4] The Sixth Circuit's post-*TransUnion* decision in *Ward v. National Patient Account Services Solutions, Inc.*, 9 F.4th 357 (6th Cir. 2021), is similar. The court held there that a plaintiff's allegation that a debt servicer's failure to adequately identify itself in a voicemail violated the FDCPA did "not bear a close relationship to traditional harms" and, accordingly, that the plaintiff couldn't "demonstrate standing based upon the statutory violations alone." *Id.* at 362. Notably, though, in so holding, the Sixth Circuit reiterated *TransUnion*'s observation that "[a] common-law or historical analogue need not be an 'exact duplicate'" to confer standing. *Id.* (quoting *TransUnion*, 141 S. Ct. at 2209). Even more to the point, the court acknowledged that "[a]ctions to enforce the 'right of privacy' have long been litigated in American courts," that "one of the purposes of the FDCPA is to stop abusive debt collection practices that contribute to 'invasions of individual privacy,'" and that if the plaintiff there had "claimed, for example, that [the servicer] improperly shared personal information with a third party"—as Hunstein alleges Preferred did here—then his "alleged harm would more closely resemble an invasion of privacy." *Id.* (quoting 15 U.S.C. § 1692).

2019), we held that receipt of a single unwelcome text message in violation of the TCPA did not bear a sufficiently close relationship to any of a handful of common-law torts. *Id.* at 1171. To that extent, we reached a bottom-line conclusion different from those later reached by the Fifth and Seventh Circuits in *Cranor* and *Gadelhak*, respectively. More important for present purposes than the result in *Salcedo*, though—this isn't a TCPA case, after all—is the court's analysis. To be sure, the opinion there suggested in one place that the plaintiff's allegations "f[e]ll short of th[e] degree of harm" that intrusion upon seclusion ordinarily entails, *see id.* at 1171, and in another that a "significant[]" difference in "degree" might disqualify an intangible-injury plaintiff, *see id.* at 1172. But the balance of the opinion emphasized that only an alleged harm that is "categorically distinct" from a common-law comparator would scuttle a plaintiff's standing. *Id.* Concerning the torts of trespass and nuisance, for instance, the panel stressed that they were different from the plaintiff's alleged harm "both in kind and in degree." *Id.* at 1171. So too, the panel said, with respect to invasion of privacy (generally) and intrusion upon seclusion, "an examination of those torts reveals significant differences in the *kind and degree* of harm they contemplate providing redress for." *Id.* at 1172 (emphasis added). Perhaps most tellingly, the *Salcedo* panel concluded its opinion by expressly rejecting any suggestion that a plaintiff's standing turns on "how small or large [his] injury is" and emphasizing that the key criterion is quality, not quantity: "Our assessment today is thus qualitative, not quantitative. We have assessed how concrete and real the alleged harm is and we have

concluded that it is not the *kind* of harm that constitutes an injury in fact." *Id.* at 1173 (emphasis added; citation omitted).

As we understand it, then, *Salcedo* does not require that a plaintiff's alleged harm be similar in *both* kind *and* degree to a common-law tort. Nor could it, of course, at least consistently with binding precedent. It's difficult to imagine a circumstance in which a plaintiff's harm is similar in both kind and degree to a common-law tort and yet is *not* precisely the same. A similar-in-both-kind-and-degree interpretation thus can't be reconciled with *Spokeo*'s description of a "close"—but not identical—relationship, *see* 578 U.S. at 341, *Muransky*'s observation that the fit between a plaintiff's statutory claim and "a pedigreed common-law cause of action need not be perfect," 979 F.3d at 926, or *TransUnion*'s reminder that "we do not require an exact duplicate" between the alleged injury and a traditionally recognized harm, 141 S. Ct. at 2204.[5]

### b

Under this sensible (and seemingly conventional) approach to *Spokeo*'s close-relationship test—namely, requiring an intangible injury to be of the same kind as a harm actionable at common

---

[5] Notably, in *Gadelhak*, now-Justice Barrett interpreted *Salcedo*—just as we do here—to hold that an alleged harm and a common-law tort must be similar in kind, but not in degree. *See Gadelhak*, 950 F.3d at 462 ("In rejecting standing in a similar case, the Eleventh Circuit suggested that the tort of intrusion upon seclusion addressed only invasions of privacy like eavesdropping and spying, which pose a different kind of harm altogether.").

law but not necessarily the same degree—Hunstein has standing here.  Hunstein has alleged a harm similar in kind to the common-law tort of public disclosure of private facts:  Under that tort, "[o]ne who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public."  Restatement (Second) of Torts § 652D (1977).  Again, Hunstein claims that the debt collector, Preferred, "disclosed" what he calls "sensitive medical information"—including his minor son's name and prior medical treatment—to "the employees of an unauthorized third-party mail house," CompuMail.  That means, based on the allegations of the complaint—which, again, we must accept as true for purposes of appeal—that *some* measure of disclosure in fact occurred.  *See, e.g.*, *Munson v. Lathrop*, 96 Wis. 386, 380 (1897) ("The writing of the message, and the delivery of it by him to the [telegraph] company for transmission, as mentioned, was a publication of the same.").  And, it seems to us, that disclosure of intensely private information—including, most notably, the status of Hunstein's debt, his minor son's name, and that his debt arose from his son's medical treatment—could clearly offend a reasonable person and is not of legitimate public concern.[6]  To be sure, Preferred's disclosure of Hunstein's private information to

---

[6] The dissent disagrees.  *See* Dissenting Op. at 7, 11–14.  We deal with its critique of our treatment of the offense and public-concern elements below.  *See infra* note 8.  First, though, we need to clean up the "publicity" issue.

CompuMail's employees might have been less widespread—less public—than the disclosures typical of actionable public-disclosure-of-private-facts claims, but that is a matter of "degree"; publication of personal information to the employees of a single entity and more widespread dissemination of that same personal information remain similar in "kind."[7]

---

[7] The dissent asserts that Hunstein can't satisfy the "publicity" element of the public-disclosure-of-private-facts tort because, it says, he alleged only a "[c]ommunication of a fact to 'a small group of persons.'"  Dissenting Op. at 7 (quoting Restatement (Second) of Torts § 652D cmt. a.)  Three responses.

First, from where does the dissent draw its (critical) "small group" premise?  Surely not from the face of the complaint, which simply alleges that Preferred sent Hunstein's private information to CompuMail's "employees."  We have no way of knowing, at this early stage in the litigation, how many of CompuMail's employees saw Hunstein's information or, for that matter, how many employees CompuMail even *has*.  Especially given our obligation to "constru[e the complaint's allegations] in the light most favorable" to Hunstein, we simply can't engage in appellate fact-finding (or speculation) to second-guess his standing.  *Taylor v. Polhill*, 964 F.3d 975, 979 (11th Cir. 2020) (quotation marks omitted).

Second, at what point—at what number of employees—would the dissent acknowledge that Preferred's communication to CompuMail was sufficiently "public" to confer standing?  What if, for example, CompuMail had 50 employees and the communication went to all of them?  100? 500? 1,000? And whatever that public-ness threshold is, how can it legitimately be described as a difference in "kind" rather than "degree"?  Let's posit, for instance, that the magic number is 100.  Does that really mean that a plaintiff in Hunstein's shoes suffers one "kind" of harm (insufficient to confer standing) if 99 employees see his private information, and an altogether different "kind" of harm (sufficient

A unique wrinkle of this case—and in particular, its litigation history—bears on and confirms our conclusion.  Publicity of the sort that underlies the tort of public disclosure of private facts entails communication, *see* Restatement (Second) of Torts § 652D

_____

to confer standing) if just one more sees it?  And can it really be that the *United States Constitution* demands that sort of bologna-slicing?

Finally, it's important to remember (again) that the question we face here is *not* whether Hunstein has stated a claim for public disclosure of private facts but, rather, whether the statutory violation that he has alleged bears a sufficiently "close relationship" to that common-law tort.  *See, e.g.*, *In re Horizon*, 846 F.3d at 639 ("We are not suggesting that Horizon's actions would give rise to a cause of action under common law.").  For reasons explained in text, we hold that it is.  Two points bear additional mention here.  First, as we recognized long ago in summarizing Louisiana law, the "oppressive treatment of a debtor, including the unreasonable giving of undue publicity to private debts, has been held to be an invasion of the debtor's right of privacy."  *Cunningham v. Sec. Inv. Co. of St. Louis*, 278 F.2d 600, 604 (5th Cir. 1960).  And that appears to be the general rule.  *See* Annotation, *Public Disclosure of Person's Indebtedness as Invasion of Privacy*, 33 A.L.R.3d 154, at § 2[a] (1970 & 2021 Supp.) ("The giving of unreasonable publicity to private debts has been generally recognized as an actionable invasion of the debtor's right of privacy.").  Second, there is no one-size-fits-all formula for determining just how widespread the dissemination has to be under the common law: "[T]he extent of the required publicity to support a claim of public disclosure of private facts varies from jurisdiction to jurisdiction."  *Fernandez-Wells v. Beauvais*, 983 P.2d 1006, 1009 (N.M. App. 1999); *see also, e.g.*, *Karch v. BayBank FSB*, 794 A.2d 763, 774 (N.H. 2002) ("[D]etermining whether a disclosure of a private matter has become one of public knowledge does not, as a matter of law, depend on the number of people told.  Whether publicity is achieved by broadcasting something private to a few people or to the masses is a conclusion best reached by the trier of fact.").  These, as we say in text, are matters of "degree."

(1977), which in turn requires "that one person has brought an idea to the perception of another." Restatement of Torts § 559, Comment a, p. 140 (1938); *see also TransUnion*, 141 S. Ct. at 2210 n.6. While not dispositive, of course, it is telling that in response to Hunstein's allegation that Preferred disclosed "sensitive medical information" to CompuMail's "employees," Preferred conceded— both in briefing and again at oral argument—that its transmission of Hunstein's information to CompuMail constituted a "communication," at least as that term is used in the FDCPA. That concession, it seems to us, further underscores that any differences between Hunstein's alleged harm and the tort of public disclosure of private facts are matters of degree, not kind.[8]

---

[8] The dissent is "baffled" by our consideration of Preferred's "communication" concession, *see* Dissenting Op. at 9—but only because the dissent reads too much into it. We don't contend that Preferred's concession is decisive. Instead, we note only that Preferred's concession of a necessary-but-insufficient component of publicity—"communication"—reinforces the conclusion that its dissemination of information to an unknown number of CompuMail's employees was sufficiently "public" to make it close enough to the tort's publicity element.

One last thing: The dissent separately faults us for giving the tort's second and third elements—offense and public-concern, *see supra* at 19, short shrift, *see* Dissenting Op. at 7, 11–14. We spend comparatively—and we think appropriately—little time on them because it seems to us painfully obvious that they are satisfied, at least for standing's "close relationship" purposes. *Cf., e.g., Wolfe v. Schaefer*, 619 F.3d 782, 784 (7th Cir. 2010) (stating that "unreasonable publicity given to another's private life" is "illustrated by," for example, "the unauthorized publicizing of a person's medical condition" or his "personal finances"); *Biederman's of Springfield, Inc. v. Wright*, 322 S.W.2d 892,

---

894 (Mo. 1959) (stating that "the status of [a] debt owed" is "a private matter . . . in which the general public had, and could have, no legitimate interest," and that announcing that information "would be offensive to persons of ordinary sensibilities"). In any event, in response to the dissent's critique, we will explain ourselves at greater length, reiterating that the question on the table is *not* whether Hunstein can make out a claim for public disclosure of private facts, but rather whether the harm addressed by the FDCPA bears a sufficiently "close relationship"—in kind, but not necessarily degree—to the harm addressed by that common-law tort.

With respect to the second element—whether publicizing the information would be highly offensive to a reasonable person—the dissent concludes that, because it "was not highly offensive at common law" for a creditor to "inform[] employers of an employee's debt," the communication of Hunstein's financial information and his minor son's name and medical-care-related information to a third party can't be, either. Dissenting Op. at 11–12. For at least two reasons—even aside from the fact that there's no issue here about disclosure to an employer—we think that's wrong.

First, and most conspicuously, the dissent ignores that Preferred communicated more—and more sensitive—information than just Hunstein's status as a debtor; it also included his minor son's name and the fact that the debt arose out of the son's medical care. Second, assuming that the dissent means to say that disclosing Hunstein's minor son's name and medical-care-related information (or even Hunstein's own status as a debtor) to CompuMail's employees wouldn't be highly offensive to a reasonable person, we fail to see how publicizing that information is different in *kind*—rather than in degree only— from prototypically offensive publications. If, for instance, Preferred had disclosed Hunstein's son's underlying "medical condition," no one would dispute the offense element. *See Wolfe*, 619 F.3d at 784. And if Preferred had announced Hunstein's debt to a room full of strangers, that too would be sufficiently offensive. *Wright*, 322 S.W.2d at 894. Thus, even accepting the dissent's premise that Preferred's disclosure in this case would fall short of giving Hunstein a winning tort claim, it's sufficient to provide standing here given its proximity in degree to paradigmatic "highly offensive" publications.

_____

Turning to the third element—whether the matter at issue is of legitimate public concern—we think that the dissent simply misunderstands its operation.  The dissent *seems* to suggest that whether a topic is of legitimate public concern depends on the audience to whom the information is communicated.  *See* Dissenting Op. at 13 ("[T]rying to apply the third element . . . is nonsensical because the public does not know anything about Hunstein's debt.").  That is incorrect.  *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 762 (1985) (analyzing whether information was of public concern, acknowledging the "individual interest" of the "specific business audience" to which information was conveyed, but not factoring that into the "public concern" determination).  To the contrary, the Supreme Court's free-speech cases—which expressly incorporate Restatement § 652D's test—make clear that public concern is an objective inquiry that turns on "the content, form, and context" of the expression.  *Connick v. Myers*, 461 U.S. 138, 143 n.5, 147 (1983).  And the Court has specified the circumstances in which a communication "deals with matters of public concern"—namely, "when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."  *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (quotation marks and citations omitted).  That's not this case.

On a proper understanding, applying the public-concern element here isn't "nonsensical," Dissenting Op. at 13—it's just remarkably straightforward.  Members of the public don't and couldn't have any legitimate interest in learning about Hunstein's private financial matters, nor do they possess a legitimate interest in learning his minor son's name or medical-care-related information.  *Compare Greenmoss*, 472 U.S. at 762 (holding that a "credit report concerns no public issue"), *and Wright*, 322 S.W.2d at 894 (stating that "the public . . . could have[] no legitimate interest" in "the status of [a] debt owed"), *with Snyder*, 562 U.S. at 454–55 (holding that signs protesting "the political and moral conduct of the United States and its citizens" touched on matters of public concern), *and Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492 (1975) ("'The commission of crime, prosecutions resulting from it, and judicial proceedings

★  ★  ★

The Supreme Court's decision in *TransUnion* looms large, of course. As we have already explained, the Court there swore off any suggestion that *Spokeo*'s close-relationship criterion requires that a plaintiff's asserted harm to be an "exact duplicate" of a common-law cause of action. 141 S. Ct. at 2204. And as we have also explained, the "kind, not degree" line that courts have drawn nicely captures the golden mean between *close* and *not exact*. But given its recency, *TransUnion* warrants a closer look.

In that case, a credit reporting agency compiled personal and financial information about individual consumers, created consumer reports, and then sold those reports to entities that requested information about the consumers. 141 S. Ct. at 2201. TransUnion, the agency, introduced an add-on product, OFAC Name Screen Alert, that compared an individual consumer's name to a list maintained by the U.S. Treasury Department's Office of Foreign Assets Control and placed an alert on the credit report if the consumer's name was a potential match. *Id.* A class of consumers with OFAC alerts on their accounts sued TransUnion

---

arising from the prosecutions . . . are without question events of legitimate concern to the public . . . ."). Hunstein's status as a debtor—to say nothing of his minor son's name and medical-care-related information—is not of public concern because it doesn't "relat[e] to any matter of political, social, or other concern to the community," nor is it "a subject of general interest and of value and concern to the public." *Snyder*, 562 U.S. at 453 (quotation marks omitted).

under the FCRA, alleging that it had violated § 1681e(b) by failing to use reasonable procedures to assure the maximum possible accuracy of their credit files. 141 S. Ct. at 2202. As relevant here, the question for the Court was whether the alleged violations of § 1681e(b) bore the required "close relationship" to the common-law tort of defamation and thus constituted a concrete injury.

The answer, the Supreme Court held, depended on the particular class members' allegations under § 1681e(b). Those who presented evidence that their credit reports had been provided to third-party businesses established a concrete injury bearing a close relationship to the common-law tort of defamation, and thus concrete injury, while those whose credit reports had not been provided to third parties did not. 141 S. Ct. at 2208–13.

In a footnote, the Court acknowledged the plaintiffs' "forfeited" argument that TransUnion had "published" their information both to its own employees and to the vendors that printed and sent the mailings that the class members received. *Id.* at 2210 n.6 (emphasis added). As relevant here, the Court explained (citing one of our unreported decisions, *Mack v. Delta Air Lines, Inc.*, 639 F. App'x 582 (11th Cir. 2016)) that American courts had not "*necessarily* recognized disclosures to printing vendors as actionable publications" and suggested that, in such an instance, the plaintiff would need to present evidence that the defendant had "brought an idea to the perception of another" and that "the document was actually read and not merely processed." 141 S. Ct. at 2210 n.6 (emphasis added). It then said that "the plaintiffs' internal publication

theory circumvents a fundamental requirement of an ordinary def-amation claim—publication—and does not bear a sufficiently 'close relationship' to the traditional defamation tort to qualify for Article III." *Id.*

That last bit, we recognize, may seem—at least on its face—to be in some tension with our holding here. In fact, though, *TransUnion*'s analysis—in particular, the part above the line—re-affirms Hunstein's standing. Preferred could, we suppose, point to *TransUnion*'s footnote in support of its contention that its commu-nication to CompuMail's employees was insufficiently "public" to bear a close relationship to the tort of public disclosure of private facts. But because the *TransUnion* plaintiffs raised the issue of pub-lication to vendors "for the first time" in the Supreme Court, for which reason it was deemed "forfeited," the Court's footnoted dis-cussion about vendors is dictum. *TransUnion,* 141 S. Ct. at 2210 n.6; *Cent. Green Co. v. United States*, 531 U.S. 425, 431 (2001) (ex-plaining that a discussion "not essential to [a court's] disposition of any of the issues contested [in the case]" is "unquestionably dic-tum"). Although we have acknowledged that "there is dicta and then there is dicta, and then there is Supreme Court dicta," *United States v. Watkins*, 10 F.4th 1179, 1182 (11th Cir. 2021) (en banc) (quotation marks omitted), there are two good reasons why the *TransUnion* dictum doesn't control here.

First, we have to account for the cases' different procedural postures. Because the case in *TransUnion* went to trial, the Su-preme Court required that "the specific facts set forth by the

plaintiff to support standing . . . be supported adequately by the evidence adduced at trial." 141 S. Ct. at 2208. Here, by contrast, the case didn't proceed beyond the motion-to-dismiss stage, at which, of course, we must "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." *Taylor v. Polhill*, 964 F.3d 975, 979 (11th Cir. 2020) (quotation marks omitted). We thus have no "evidence" by which to evaluate whether anyone at CompuMail "actually read and not merely processed" Hunstein's sensitive information. *TransUnion*, 141 S. Ct. at 2210 n.6. What we do have, as already explained, are (1) Hunstein's allegation that Preferred "disclosed" his son's "sensitive medical information" to CompuMail's "employees" and (2) Preferred's concession that, in so doing, it "communicat[ed]" Hunstein's personal information to CompuMail, at least as that term is used in the FDCPA.

Second, overreading *TransUnion*'s dictum would transform *Spokeo*'s "close relationship" test into a "perfect match" test—thereby effecting (sub silentio) a sea change in Article III standing doctrine—and, in fact, would do the very thing that the Court (again, above the line) said it was *not* doing, namely, "requir[ing] an exact duplicate" of a common-law claim. 141 S. Ct. at 2204. Indeed, a perfect-match interpretation of the close-relationship test wouldn't just contravene *TransUnion*'s language—it would contravene that decision's *holding*. Here's why: The defendant in *TransUnion* argued that certain class members didn't suffer a harm with a sufficiently "close relationship" to defamation because the

OFAC alerts on the disseminated credit reports were only misleading—not literally false, as the tort of defamation ordinarily requires. *Id.* at 2209. The Supreme Court rejected that attempt at equivalency, concluding—as already noted—that "[i]n looking to whether a plaintiff's asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts, we do not require an exact duplicate." *Id.*; *see also id.* at 2204 ("*Spokeo* does not require an exact duplicate in American history and tradition."). In the end, then, *TransUnion* reaffirms our conclusion that Hunstein has alleged a harm that bears a close relationship to a harm that has traditionally been recognized in American courts.[9]

---

[9] Tellingly, since *TransUnion* came down, three of our sister circuits have relied on its holding, rather than its dictum, to conclude that a perfect match between an alleged harm and a common-law tort isn't required. *See, e.g., Lupia*, 8 F.4th at 1192 (holding that an unconsented-to phone call "poses the same kind of harm recognized at common law" as intrusion upon seclusion and citing *TransUnion*'s language that "*Spokeo* does not require an exact duplicate in American history and tradition" (quotation marks omitted)); *Ward*, 9 F.4th at 362 (citing and quoting *TransUnion* for the proposition that "[a] common-law or historical analogue need not be an 'exact duplicate'" to confer standing); *Farrell v. Blinken*, 4 F.4th 124, 133 (D.C. Cir. 2021) (holding that "[t]he right of election following the Revolution is not identical to the right to expatriate" and emphasizing that "our jurisdiction under the Constitution 'does not require an exact duplicate [common law injury] in American history and tradition'" (quoting *TransUnion*, 141 S. Ct. at 2209)).

**2**

Although it presents a closer question, we conclude that "the judgment of Congress" also favors Hunstein.  Congress, of course, expresses its "judgment" in only one way—through the text of duly enacted statutes.  Even assuming that § 1692c(b) does not clearly enough express Congress's judgment that injuries of the sort that Hunstein alleges are actionable, here Congress went further to "explain itself."  *Huff*, 923 F.3d at 466.  In particular, as already noted, in a section of the FDCPA titled "Congressional findings and declaration of purpose," Congress identified the "invasion[] of individual privacy" as one of the harms against which the statute is directed.  15 U.S.C. § 1692(a).  That, we think, is sufficient.  *See Trichell*, 964 F.3d at 999 (listing "invasions of individual privacy" as one of the "serious harms" enumerated in § 1692(a)).[10]

---

[10] The dissent accuses us of "play[ing] the trick of defining very broadly the judgment of Congress" by looking to the "general purposes" that Congress expressly enacted—only, for its part, to conclude that Congress wasn't concerned with mail vendors, in particular, because a single staff-drafted Senate Report highlights other "specific abuses."  Dissenting Op. at 19.  No.  As between the duly enacted statute's text—which tells us that Congress was aimed at preventing "invasions of individual privacy," 15 U.S.C. § 1692(a)—and the unenacted legislative history, we must privilege the former.

The dissent separately reasons from two references to the term "telegrams" in the FDCPA that Congress "acquiesce[d]" in "the use of intermediaries" *generally*.  Dissenting Op. at 17.  From there, it jumps to the conclusion that "simple transmission of information along a chain that involves one extra link because a company uses a mail vendor to send out the letters about debt

It's true that we pointed in *Trichell* to the FDCPA's language that a person may recover "any actual damage sustained," 15 U.S.C. § 1692k(a), to "reinforce[]" our conclusion that the plaintiff's injury there—alleged under a different statutory provision, § 1692e—didn't ipso facto constitute a concrete injury. *Trichell*, 964 F.3d at 1000. But we don't read either *Trichell* or § 1692k(a) as categorically limiting the class of FDCPA plaintiffs to those with *actual damages*.[11] That's especially so where, as here—and unlike *Trichell*—the alleged harm fits neatly within the "invasions of individual privacy" that Congress expressly addressed.   15 U.S.C. § 1692(a).

---

is not a harm at which Congress was aiming." *Id.* at 18. We disagree. First, that's not what Hunstein's complaint alleges—it asserts that his private information was conveyed to CompuMail's "employees," not that it was "simpl[y] transmi[tted]" to him through a third party. Second, we are reluctant to draw a conclusive implication from passing references to an all-but-obsolete technology—one that, we note, Congress never expressly endorsed—that appear in different portions of the FDCPA, to override § 1692c(b)'s plain language. Third, and again, it appears to us that the dissent is impermissibly collapsing standing with the merits. The dissent's theory seems to be that because Congress implicitly acquiesced in the use of intermediaries—or at least one such intermediary—Preferred didn't violate the FDCPA by using one. Maybe, maybe not. (More on the merits below.) But that goes to whether Hunstein has a valid claim under § 1692c(b), not whether he has standing to sue.

[11] The dissent does. *See* Dissenting Op. at 21–22. But that can't be right. Imagine, for instance, that instead of conveying Hunstein's private medical- and debt-related information to CompuMail's employees, Preferred had plastered it on a billboard in Times Square. Still no standing absent proof of actual damages?

Opinion of the Court

⋆   ⋆   ⋆

Because (1) § 1692c(b) bears a close relationship to a harm that American courts have long recognized as cognizable and (2) Congress's judgment indicates that violations of § 1692c(b) constitute a concrete injury, we conclude that Hunstein has the requisite standing to sue.

## III

Having determined that Hunstein has standing to sue under § 1692c(b), we now consider the merits of his case. Recall that § 1692c(b) states that, subject to several exceptions, "a debt collector may not communicate, in connection with the collection of any debt, with any person" other than the consumer. 15 U.S.C. § 1692c(b). The parties agree that Preferred is a "debt collector," that Hunstein is a "consumer," and that the alleged debt at issue here was a "consumer debt," all within the meaning of § 1692c(b). As we have explained, the parties also agree that Preferred's transmittal of Hunstein's personal information to CompuMail constitutes a "communication" within the meaning of the statute.[12] Accordingly, the sole question before us is whether Preferred's communication with CompuMail was "in connection with the

---

[12] Section 1692a(2) defines communication as "the conveying of information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. § 1692a(2).

collection of any debt," such that it violates § 1692c(b).[13]  Hunstein contends that the plain meaning of the phrase "in connection with

---

[13] The dissent suggests—without coming right out and saying—that Compu-Mail is not a "person" within the meaning of the statute but, rather, is a "medium." Dissenting Op. at 9 n.6.  In making that suggestion, the dissent points to the FDCPA's definition of "communication" to mean "the conveying of information regarding a debt directly or indirectly to any *person* through any *medium*." 15 U.S.C. § 1692a(2) (emphases added).  We assume that the point must be that the terms "person" and "medium" are mutually exclusive and that because CompuMail fits within one of numerous definitions of the term "medium"—"a person through whom a purpose is accomplished," *see Medium*, Webster's Third New International Dictionary 1403 (1961)—then it can't also be a "person" within the meaning of the statute.  So, the argument presumably goes, (1) no "communication" within the meaning of § 1692a(2) occurred, and (2) even if it did, Preferred didn't communicate "with any person" within the meaning of § 1692c(b).  We disagree.

The dissent's argument rests on a fundamental misunderstanding of the terms "medium" in § 1692a(2) and "person" in § 1692c(b).  To be sure, *one* dictionary definition of "medium" is "a person through whom a purpose is accomplished."  But just as surely, § 1692's text, context, and structure indicate that Congress intended "medium" to carry another *Webster's*-approved meaning:  "a channel, method, or system of communication, information, or entertainment."  *Medium*, Webster's Third, *supra*, at 1403.  First, and perhaps most obviously, that understanding comports with common sense.  In the context of the FDCPA, it seems overwhelmingly likely that "medium" refers to different forms that debt-related communications might take—in the old days, letters and phone calls; more recently, emails, text messages, etc.  Second, more technically, the dissent's medium-as-intermediary reading introduces its own interpretive problem.  Section 1692c(b) prohibits communication in connection with the collection of any debt "with any person other than," among others, "the consumer [or] his attorney."  But the dissent's suggested definition of "medium" plainly includes the consumer's attorney; he is a person through whom a purpose (the eventual collection of a debt) is

the collection of any debt" and relevant precedents show that it was and does.  Preferred, conversely, urges us to adopt a "factor-based analysis" that shows that, it says, its communication with Compu-Mail was not "in connection with the collection of any debt."

　　We begin with the plain meaning of the phrase "in connection with" and its cognate word, "connection."  Dictionaries have adopted broad definitions of both.  *Webster's Third* defines "connection" to mean "relationship or association," *Connection*, Webster's Third New International Dictionary at 481 (1961), and the *Oxford Dictionary of English* defines the key phrase "in connection with" to mean "with reference to [or] concerning," *In Connection With*, Oxford Dictionary of English at 369 (2010).  Usage authorities further explain that the phrase "in connection with" is

---

accomplished.  If, under the dissent's understanding, a consumer's attorney is (like a vendor) a "medium," it would render § 1692c(b)'s "with any person other than" clause unintelligible.

　　Applying the ordinary, commonsense definition of "medium" to denote a "channel, method, or system of communication"—which squares with statutory text and context—it follows that mail vendors like CompuMail are indeed "persons" within the meaning of §§ 1692a(2) and § 1692c(b).  Although the FDCPA doesn't define the term "person," both § 1692a(2) and § 1692c(b) modify it with the expansive term "any," which we have said "means all." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001).  And § 1692c(b) goes on to refer to communications "with any person other than," among others, "a consumer reporting agency."  If an inanimate credit reporting agency is a "person," then it stands to reason that an inanimate mail vendor like CompuMail is, as well.

"invariably a vague, loose connective." Bryan A. Garner, Garner's
Dictionary of Legal Usage 440 (3d ed. 2011).

Preferred's transmittal to CompuMail included specific de-
tails regarding Hunstein's debt: Hunstein's status as a debtor, the
precise amount of his debt, the entity to which the debt was owed,
and the fact that the debt concerned his son's medical treatment,
among other things. It seems to us inescapable that Preferred's
communication to CompuMail at least "concerned," was "with ref-
erence to," and bore a "relationship [or] association" to its collec-
tion of Hunstein's debt. We thus hold that Hunstein has alleged a
communication "in connection with the collection of any debt" as
that phrase is commonly understood.

Preferred resists that conclusion on three different grounds,
which we address in turn.

## A

First, Preferred relies on our interpretation of another
FDCPA provision, § 1692e, to argue that communications "in con-
nection with the collection of any debt" necessarily entail a demand
for payment. In relevant part, § 1692e states that "[a] debt collector
may not use any false, deceptive, or misleading representation or
means *in connection with the collection of any debt.*" 15 U.S.C.
§ 1692e (emphasis added). In the line of cases interpreting the
meaning of "in connection with the collection of any debt" in
§ 1692e, we have focused on the language of the underlying com-
munication. In *Reese v. Ellis, Painter, Ratterree & Adams, LLP,*

for instance, in concluding that a law firm's letter to a consumer was "in connection with the collection of any debt" within the meaning of § 1692e, we emphasized that the letter expressly stated that the firm was attempting to collect a debt and was acting as a debt collector, demanded full and immediate payment, and threatened to add attorneys' fees to the outstanding balance if the debtors didn't pay. 678 F.3d 1211, 1217 (11th Cir. 2012). Similarly, in *Caceres v. McCalla Raymer, LLC*, we held that a collection letter constituted a "communication in connection with the collection of a[ny] debt" under § 1692e for similar reasons. 755 F.3d 1299, 1301–03 (11th Cir. 2014). Quoting the letter, we emphasized "that it is 'for the purpose of collecting a debt;' it refers in two additional paragraphs to 'collection efforts;' it states that collections efforts will continue and that additional attorneys' fees and costs will accrue; it states the amount of the debt and indicates that it must be paid in certified funds; and it gives the name of the creditor and supplies the law firm's phone number in the paragraph where it talks about payments." *Id.* at 1303.

Relying on *Caceres* and *Reese*—both of which, again, addressed § 1692e—the district court here adopted the following test:

> When determining whether a communication was made in connection with the collection of a[ny] debt, the courts look to the language of the communication itself to ascertain whether it contains a demand for payment and warns of additional fees or actions if payment is not tendered. Consequently, when determining whether the transmission of information to a

third party constitutes a violation of the FDCPA, it is important to consider whether the communication makes an express or implied demand for payment.

The district court's conclusion that the phrase "in connection with the collection of any debt" necessarily entails a demand for payment defies the language and structure of § 1692c(b) for two separate but related reasons—neither of which applies to § 1692e. First, the demand-for-payment interpretation would render superfluous the exceptions spelled out in §§ 1692c(b) and 1692b. Consider as an initial matter the exceptions specified in § 1692c(b) itself: "[A] debt collector may not communicate, in connection with the collection of any debt, with any person *other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector . . . .*" 15 U.S.C. § 1692c(b) (emphasis added). Communications with four of the six excepted parties—a consumer reporting agency, the creditor, the attorney of the creditor, and the attorney of the debt collector—would *never* include a demand for payment. The same is true of the parties covered by § 1692b and, by textual cross-reference, excluded from § 1692c(b)'s coverage: "person[s] other than the consumer" with whom a debt collector might communicate "for the purpose of acquiring location information about the consumer." *Id.* § 1692b. A debt collector would presumably never make a demand for payment of a party matching that description.

The upshot is that the phrase "in connection with the collection of any debt" in § 1692c(b) must mean something more than a mere demand for payment.  Otherwise, Congress's enumerated exceptions would be redundant.  Under the district court's demand-for-payment interpretation, Congress wouldn't have needed to include exceptions for communications with consumer reporting agencies, creditors, attorneys of creditors, attorneys of debt collectors, or persons providing a debtor's location information; those communications would have been foreclosed ipso facto by the phrase "in connection with the collection of any debt."  It is a "cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (quotation marks omitted); *accord, e.g.*, Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012) ("If possible, every word and every provision is to be given effect . . . .  None should be ignored.  None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.").  Because it is possible—and indeed, we think, more natural—to interpret § 1692c(b) in a way that does not render most of its textually specified exceptions redundant, we will do so.

Second, and relatedly, the district court's interpretation renders yet another portion of § 1692c(b) meaningless.  By insisting on a demand for payment, the district court essentially interpreted "in connection with the collection of any debt" to mean "to collect any

debt." Under this interpretation, the key phrase "in connection with" has no independent meaning or force. But as just explained, we have a duty to "give effect, if possible, to every clause and word of a statute." *Duncan*, 533 U.S. at 174.

The district court seems to have been led astray by its reliance on decisions interpreting § 1692e, whose language and operation differ from § 1692c(b)'s in important respects.[14] As a linguistic matter, § 1692e contains none of the specific exceptions that § 1692c(b) does; accordingly, there was no risk in *Reese* or *Caceres* that, by reading a "demand for payment" gloss into § 1692e, we would render other portions of that statute redundant or meaningless. And as an operational matter, § 1692e—which prohibits "false, deceptive, or misleading representation or means in connection with the collection of any debt"—covers the sorts of claims that are brought by recipients of debt collectors' communications—*i.e.*, debtors. *See Caceres*, 755 F.3d at 1300–01 (case brought by recipient of letter, the debtor); *Reese*, 678 F.3d at 1214 (same). As its title indicates, by contrast, § 1692c(b), targets debt collectors' "[c]ommunication with third parties," not debtors. In the typical § 1692c(b) case, the debtor isn't the recipient of the challenged communication. Linguistic differences aside, this practical operational difference undermines any argument that the meaning of the

---

[14] These contextual clues illustrate the fact that the "presumption of consistent usage"—which is at times persuasive—"is particularly defeasible by context." Scalia & Garner, *supra*, at 170–71.

phrase "in connection with the collection of any debt" must necessarily be the same in § 1692c(b) as in § 1692e.

## B

Preferred separately urges us to adopt the holistic, multifactor balancing test that the Sixth Circuit decreed in its unpublished opinion in *Goodson v. Bank of America, N.A.*, 600 F. App'x 422 (6th Cir. 2015). That test counsels courts confronting § 1692e's "in connection with the collection of any debt" language to take into account the following seven considerations:

> (1) the nature of the relationship of the parties; (2) whether the communication expressly demanded payment or stated a balance due; (3) whether it was sent in response to an inquiry or request by the debtor; (4) whether the statements were part of a strategy to make payment more likely; (5) whether the communication was from a debt collector; (6) whether it stated that it was an attempt to collect a debt; and (7) whether it threatened consequences should the debtor fail to pay.

*Goodson*, 600 F. App'x at 431. We decline Preferred's invitation for two related reasons.

First, and perhaps most obviously, *Goodson* and the cases that have relied on it concern § 1692e—not § 1692c(b). And as just explained, §§ 1692c(b) and 1692e differ both (1) linguistically, in that the former includes a series of exceptions that an atextual

reading risks rendering meaningless, while the latter does not, and (2) operationally, in that they ordinarily involve different parties. *Goodson*'s seventh factor—whether the communication threatened consequences should the debtor fail to pay—illustrates this point. It makes little sense for a debt collector to threaten consequences should the debtor fail to pay in a communication that is not sent to the debtor himself.

Second, we believe that in the context of § 1692c(b), the phrase "in connection with the collection of any debt" has a discernible ordinary meaning that obviates the need for resort to extratextual "factors." All too often, multifactor tests—especially *seven*-factor tests like *Goodson*'s—obscure more than they illuminate. Parties to FDCPA-governed transactions—debtors, creditors, debt collectors, lawyers, etc.—are entitled to guidance about the scope of permissible activity. They are likelier to get it from even broadly framed statutory language than from judge-made gestalt.

## C

Lastly, Preferred makes what we'll call an "industry practice" argument. It contrasts what it says is the widespread use of mail vendors like CompuMail and the relative dearth of FDCPA suits against them. More particularly, Preferred identifies cases involving mail vendors and emphasizes that none of them holds that a debt collector's mail vendor violated the FDCPA. True enough, but none of the cases that Preferred cites involved § 1692c(b)

claims, and the courts in those cases certainly had no obligation to *sua sponte* determine whether the collectors' communications to their vendors violated § 1692c(b). That this is (or may be) the first case in which a debtor has sued a debt collector for disclosing his personal information to a mail vendor hardly proves that such disclosures are lawful.

One final (and related) point: It's not lost on us that our interpretation of § 1692c(b) runs the risk of upsetting the status quo in the debt-collection industry. We presume that, in the ordinary course of business, debt collectors share information about consumers not only with dunning vendors like CompuMail, but also with other third-party entities. Our reading of § 1692c(b) may well require debt collectors (at least in the short term) to in-source many of the services that they had previously outsourced, potentially at great cost. We recognize, as well, that those costs may not purchase much in the way of "real" consumer privacy. It may well turn out—indeed, for all we know, it may be shown through further factual development in this very case—that the CompuMails of the world do not routinely read, care about, or abuse the information that debt collectors transmit to them. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable."). Even so, our obligation is to interpret the law as written and, at this stage of the proceedings, to apply it to the facts as alleged in Hunstein's complaint— whether or not we think the resulting consequences are

particularly sensible or desirable.  Needless to say, if Congress thinks that we've misread § 1692c(b)—or even that we've properly read it but that it should be amended—it can say so.

## IV

To sum up, with the benefit of the Supreme Court's decision in *TransUnion*, we hold that Hunstein has Article III standing to bring his claim under § 1692c(b).  Further, because Preferred's transmittal of Hunstein's personal debt-related information to CompuMail constituted a communication "in connection with the collection of any debt" within the meaning of § 1692c(b)'s key phrase, we conclude that Hunstein has adequately stated a claim.

**REVERSED and REMANDED.**

TJOFLAT, Circuit Judge, Dissenting:

When we originally held that Hunstein had standing, the Supreme Court had not yet issued its opinion in *TransUnion LLC v. Ramirez*. Now, with the benefit of the Supreme Court's reasoning in *TransUnion*, I have changed my mind because this Court's standing analysis sweeps much more broadly than *TransUnion* would allow.

## I.

In order to satisfy the injury-in-fact requirement of standing, the plaintiff's harm must be concrete and particularized. A concrete harm can be a tangible harm, a material risk of harm, or an intangible harm.[1] Relevant to this analysis is *Spokeo*'s standard for intangible harm: "The violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact . . . [so] a plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540,1549 (2016) (emphasis in original). And a statutory violation, an intangible harm, can give rise to standing when "history and the judgment of Congress" support a finding of

---

[1] Intangible harm is a broader category than statutory violations, and statutory violations are a subspecies of intangible harm. *See Transunion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (explaining that, among other kinds of intangible harm, "harms specified by the Constitution" like the "abridgment of free speech" and "infringement of free exercise" are intangible harms); *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 926 (11th Cir. 2020) (en banc) (same).

2                          Tjoflat, J., Dissenting                    19-14434

standing. *See id.* In short, at the motion to dismiss stage, if the plaintiff is pleading an intangible harm, his complaint must contain sufficient facts to establish that history and the judgment of Congress support standing. *See Warth v. Seldin*, 422 U.S. 490, 517, 95 S. Ct. 2197, 2215 (1975) (evaluating what the plaintiff's complaint alleged to determine whether there were sufficient facts upon which to base standing and explaining that "[i]t is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers"); *Muransky*, 979 F.3d at 921 ("Because the plaintiff alleged only a statutory violation, and not a concrete injury, he has no standing.").

Now, I turn to the overlay *TransUnion* gave us. In *TransUnion*, at issue was 15 U.S.C. § 1681e(b) of the Fair Credit Reporting Act ("FCRA"), which requires consumer reporting agencies to "follow reasonable procedures to assure maximum possible accuracy" in its credit files. When a consumer reporting agency "willfully fails to comply" with § 1681e(b) "with respect to any consumer," that agency "is liable to that consumer" for both actual and statutory damages, as well as for punitive damages and attorney's fees. *TransUnion*, 141 S. Ct. at 2201 (quoting 15 U.S.C. § 1681n(a)).

The plaintiffs in *TransUnion* were 8,185 people who claimed that TransUnion, a consumer reporting agency, "failed to use reasonable procedures to ensure the accuracy of their credit files" under § 1681e(b). *Id.* at 2200. The Supreme Court divided the plaintiffs into two groups: 1,853 class members whose reports were

disseminated to third-party businesses and 6,332 class members whose reports were never published. The Supreme Court assumed that TransUnion had violated its obligations under the FCRA as to all 8,185 class members. *Id.* at 2208. But, the Supreme Court said, a violation of the statute alone is not enough to create standing because "an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *Id.* at 2205. This difference matters, the Supreme Court explained, because "Congress may create causes of action for plaintiffs to sue defendants who violate those legal prohibitions or obligations . . . . [but] [o]nly those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court" since "under Article III, an injury in law is not an injury in fact." *Id.*

On that basis, the Supreme Court used the *Spokeo* analysis to determine that as to the 1,853 class members whose reports were published, TransUnion's violation of § 1681e(b) was analogous to the common law tort of defamation. *Id.* at 2208–09. But, not so as to the other 6,332 class members. The Supreme Court explained that because the reports of the other 6,332 class members were never disseminated, TransUnion's violation of the statute had no common-law analogue such as to satisfy the *Spokeo* analysis for intangible harms. *Id.* at 2209–10 ("[T]here is no historical or common-law analog[ue] where the mere existence of inaccurate

information, absent dissemination, amounts to concrete injury."
(internal quotation marks and citation omitted)).  The Supreme
Court's reasoning here certainly suggests that under *Spokeo*, if
there is no common-law analogue to a plaintiff's alleged injury,
then the judgment of Congress can do nothing to overcome that
pleading failure.  *Id.* at 2205 ("But even though 'Congress may "el-
evate" harms that "exist" in the real world before Congress recog-
nized them to actionable legal status, it may not simply enact an
injury into existence, using its lawmaking power to transform
something that is not remotely harmful into something that is.'
*Hagy v. Demers & Adams*, 882 F.3d 616, 622 (6th Cir. 2018) (Sut-
ton, J.) (quoting *Spokeo*, 578 U.S., at 341, 136 S. Ct. 1540).").

    *TransUnion* stands for the proposition that the *Spokeo* anal-
ysis for intangible harms based on the violation of a statute—that
is, looking at history and the judgment of Congress—is individual-
ized for every plaintiff's injury.  Just because some plaintiffs' inju-
ries will have a common-law analogue and are the very kind of in-
juries Congress was trying to prevent does not mean that other
plaintiffs, who allege a violation of the very same statute, will get a
golden ticket to standing without also satisfying what *Spokeo* re-
quires.

## II.

### A. *History*

    I start with the premise that the FDCPA did not mean to
eliminate debt collection practices.  It meant to eliminate *abusive*

debt collection practices.  And that difference should animate how we view standing in this case.

This Court's opinion today acknowledges that *Spokeo* guides our analysis of Hunstein's injury, but it goes off the rails because it ignores what *TransUnion* requires a plaintiff to allege in the context of an intangible harm—facts that allow us to find a common-law analogue to the alleged statutory violation.   The Court pays lip service to *TransUnion* by focusing on two points that I deem to be ancillary to this case's decision: 1) *TransUnion* does not require an exact match between the harm caused by the statutory violation and the common-law analogue,[2] Majority Op. at 9, 12, and 2) *TransUnion*'s footnote six does not foreclose finding public disclosure of private facts in this case where Preferred sent Hunstein's information to its mail vendor, CompuMail,[3] Majority Op. at 26–29.

---

[2] This point is ancillary, because, as I will explain, no one disputes that the match need not be exact.  But Judge Newsom's approach leans more toward a "no-match" test than an "exact" match test, and that does not comport with *Spokeo* and *TransUnion*.

[3] This point is ancillary because footnote six does not directly deal with public disclosure of private facts.  Footnote six talks about publication, not publicity, and in the context of defamation, not public disclosure of private facts.  It is worth noting that in footnote six the Supreme Court dismissed a common-law tort comparison because the plaintiffs' theory "circumvented a fundamental requirement of an ordinary defamation claim—publication." *TransUnion*, 141 S. Ct. at 2210 n.6.  So, the Supreme Court was carefully looking at key elements of the tort to determine whether an alleged statutory violation has a

6                    Tjoflat, J., Dissenting                    19-14434

Reminding us that *TransUnion* does not demand a perfect match between the common-law analogue and the statutory violation, the Court uses Hunstein's allegation that his "sensitive medical information" was sent to "the employees of an unauthorized third-party mail house" to hold that the violation of the statute Hunstein experienced was analogous to public disclosure of private facts. Majority Op. at 19.  The tort of public disclosure of private facts is defined as follows: "One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public."  Restatement (Second) Torts § 652D (Am. L. Inst. 1977).  So, this tort has three elements: 1) publicity of private information, 2) that would be highly offensive to a reasonable person, and 3) that is not of legitimate public concern.  And "publicity" in this context means more than mere publication.  *Id.* cmt a.  Publicity "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."  *Id.*

The Court's opinion tries to explain how Hunstein's alleged statutory violation is "public," such as to fit into the tort of public disclosure of private facts.  It says that "*some* measure of disclosure

_____

"close relationship" to the common-law tort, something the Court's opinion today does not do.  *Id.*

in fact occurred" based on Hunstein's allegations that employees of the mail vendor received Hunstein's information from Preferred.  Majority Op. at 19–20 (emphasis in original).  Apparently, the Court thinks that "*some* measure of disclosure" is close enough to publicity to find a common-law analogue with the tort of public disclosure of private facts.  Majority Op. at 19.

The Court's opinion gives one whole sentence to the other two elements of the tort: whether the publicity would be highly offensive to a reasonable person and whether it would be of legitimate concern to the public.  This is because the last two elements of the tort rise and fall with the first element of the tort, publicity.  The Court's common-law analogue analysis is deficient because Hunstein's allegations fail the first element and necessarily then fail all the other elements.  There was no publicity in this case.  The only entity to which Preferred transmitted Hunstein's information was CompuMail.  This certainly is not to the public at large.  Communication of a fact to "a small group of persons" is *not* publicity.[4]

---

[4] The Court tries to get into a numbers game as to how many people must see the personal information before it becomes public.  That analysis completely misses the point. In 1890, Warren and Brandeis wrote *The Right to Privacy*, an article in the Harvard Law Review often credited with framing the tort of invasion of privacy.  *See* Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890); *Toffolini v. LFP Publishing Group, LLC*, 572 F.3d 1201, 1206 (11th Cir. 2009).  The purpose of the tort was to combat newspapers probing into individuals' personal lives. *Id.* at 196.  When I reference "a small group of persons," as mentioned in the Restatement, I am referring to private communication, that is, communication not meant to be exchanged with the world. *See Tureen*, 572 F.2d at 417–18 ("Thus it is not an

8                    Tjoflat, J., Dissenting                    19-14434

Restatement (Second) of Torts § 652D cmt. a. (1977).  Cases involv-
ing this tort have implied that "the invasion of privacy [including
public disclosure of private facts] requires publicity in the broad,
general sense of the word 'public.'"  *Tureen v. Equifax, Inc.*, 571
F.2d 411, 418 (8th Cir. 1978).[5]  This means Hunstein's allegations
fail all three elements of public disclosure of private facts.  In other
words, the Court's opinion tries to fit a "square cause[] of action

───────────────

invasion of the right of privacy, within the rule stated in this Section, to com-
municate a fact concerning the plaintiff's private life to a single person or even
to a small group of persons.  On the other hand, any publication in a newspa-
per or a magazine, even of small circulation, or in a handbill distributed to a
large number of persons, or any broadcast over the radio, or statement made
in an address to a large audience, is sufficient to give publicity within the mean-
ing of the term as it is used in this Section.  The distinction, in other words, is
one between private and public communication.").

[5] In *Tureen*, the court held that it was not a public disclosure of private facts
when an insurance company hired a consumer reporting firm to investigate
an individual with a health insurance policy, even though "insurance investi-
gations [are] the type of conduct most likely to intrude upon the consumer's
right to privacy."  571 F.2d at 416.  This was because the publicity element was
missing—i.e., the consumer reporting firm was only reporting to a single com-
pany, the health insurance company, not to the public at large.  *Id.* (explaining
that "there must be evidence of publicity in the sense of a disclosure to the
general public or likely to reach the general public, as opposed to 'publication'
required in a defamation action, in order for plaintiff to make a submissible
case of invasion of privacy by public disclosure of private facts"); *see also*
*Biederman's of Springfield, Inc. v. Wright*, 322 S.W.2d 892, 896 (Mo. 1959)
(holding that debt collection practices through third parties meet the require-
ments of the public disclosure of private facts when they are "unreasonable
and oppressive," that is, "degrading and embarrassing," not simply when debt
is being collected).

into a round tort" like Judge Grant warned against in *Muransky*. 979 F.3d at 931. If Hunstein's alleged statutory violation is analogous to public disclosure of private facts, *TransUnion*'s close-relationship test is really a third-cousin-twice-removed test.

In a last-ditch effort to try to explain how Hunstein's allegations amount to publicity, the Court says that "Preferred conceded" that "its transmission of Hunstein's information to Compu-Mail constituted a 'communication,' at least as that term is used in the FDCPA." Majority Op. at 22. The Court finds this significant because publicity for the tort of public disclosure of private facts "entails communication." Majority Op. at 21. The Court then says that this concession "underscores that any differences between Hunstein's alleged harm and the tort of public disclosure of private facts are matters of degree, not kind." Majority Op. at 22.

I am baffled by this reasoning. This is like saying that sugar cookie batter is the same thing as chocolate chip cookie batter because sugar cookie batter would be chocolate chip cookie batter if you added chocolate chips. Of course, communication could lead to publicity if the communication was to a large group of people, such as to be public. But communication can also be private, and just because it could be public does not mean that it actually was public. Preferred's concession that its transmission to CompuMail was a communication[6] makes not a whit of difference as to

---

[6] Although we need not reach the merits of this case because Hunstein does not have standing, it is worth noting that the Court's opinion accepts that

10                     Tjoflat, J., Dissenting                     19-14434

whether Hunstein's allegations match in any respect the common-law tort of public disclosure of private facts.  And they do not.

---

CompuMail is a "person" within the meaning of the statute and that Preferred's transmission of information to CompuMail is a "communication."  If we were reaching the merits, which we should not, there is a strong argument that CompuMail is a "medium" rather than a "person" under the language of the statute and that Preferred was not communicating with CompuMail when it transmitted information, just like a debt collector is not communicating with a telegram company when it sends a telegram to a debtor.  *See* 15 U.S.C. § 1692(a) (defining "communication" as "the conveying of information regarding a debt directly or indirectly to any person through any medium").  So, if CompuMail is a medium, and not a person, then no communication has occurred.  The Court has two responses to this common-sense interpretation.  First, it says that to construe "medium" as including mail vendors would render § 1692c(b) unintelligible because that statute includes consumers' (a.k.a. debtors') attorneys as a person, who, the Court says, would be "mediums" under my view.  Second, the Court says that consumer reporting agencies are persons under the plain language of § 1692c(b), so mail vendors must be too.  To the first point, this is an oversimplification.  The attorney is a representative of the consumer, not just a conduit of information.  To the second point, consumer reporting agencies and mail vendors serve fundamentally different purposes. Consumer reporting agencies serve the *independent* function of "assembling or evaluating consumer credit information," which they then transmit to other entities.  Fair Credit Reporting Act, 15 U.S.C. § 1681a(f).  So, they too, like a consumer's attorney are a person for purposes of the statute because they are more than mere conduits of information.  Not so with mail vendors.  Debt collectors do not send mail vendors information for the mail vendor's keeping.  The mail vendor's sole purpose is to take that information and turn it into a debt collection notice, just like a telegram operator's position exists for the purpose of transmitting a message.  But I leave this discussion for another day when our plaintiff has standing.

The Court's analysis of the last two elements is wholly con-
tained here: "And, it seems to us, that disclosure of intensely pri-
vate information—including, most notably, the status of Hun-
stein's debt, his minor son's name, and that his debt arose from his
son's medical treatment—could clearly offend a reasonable person
and isn't of legitimate public concern." Majority Op. at 19.  The
Court's dearth of analysis to two of the three necessary elements
of the tort of public disclosure of private facts signals the sheer mis-
fit between sending debt collection notices through a mail vendor
and the tort itself.  I also note that the Court assumes that what is
highly offensive to a reasonable person should be judged by its own
opinion of what is highly offensive to a reasonable person without
reference to the common law conceptions of debt.

And, at common law, debt notifications to third parties were
not highly offensive to a reasonable person.  For instance, at com-
mon law, a creditor did not violate a debtor's right to privacy when
it informed employers of an employee's debt.  *See, e.g.*, *Midwest
Glass Co. v. Stanford Developments Co.*, 339 N.E.2d 274, 277 (Ill.
Ct. App. 1975) ("[A] creditor has a right to take reasonable action
to pursue his debtor and persuade payment, although the steps
taken my result in some invasion of the debtor's privacy."); *Housh
v. Peth*, 133 N.E.2d 340, 344 (Ohio 1956); *Patton v. Jacobs*, 78
N.E.2d 789, 792 (Ind. App. 1948) ("'The fact that in the usual course
of business the communication may pass through the hands of
clerks or stenographers, whether in the employ of the writer or the

12                    Tjoflat, J., Dissenting                    19-14434

addressee, does not alter" the conclusion that creditors may communicate with employers about the debts of an employee.).

Under the Court's theory, this sort of debt notification to a debtor's employer would be "public" because at least "some measure of disclosure" occurred. I cannot tell whether, in the eyes of the Court, it would be highly offensive to a reasonable person or of legitimate public concern because the Court has provided no test by which to evaluate whether disclosure about debt would be highly offensive to a reasonable person or of legitimate public concern. What I can tell is that it was not highly offensive at common law. This is so because it was "understood that the right of privacy does not extend so far as to subvert those rights which spring from social conditions, including business relations. By becoming a member of society one surrenders those natural rights which are incompatible with social conditions." *Munden v. Harris*, 134 S.W. 1076, 1079 (Mo. Ct. App. 1911).[7]

---

[7] In the libel context, another way to think about what is highly offensive to a reasonable person, courts generally have not considered disclosure of debt to be libelous per se. *See* 53 C.J.S. Libel and Slander, § 47 ("As a general rule, however, where the charge or imputation does not affect the person in a business, vocation, or profession, it is not libelous per se merely to publish a statement that the person owes money, or owes a debt which is past due, or to charge the person with failure or refusal to pay a just debt, or to state that there is a dispute between the parties as to a debt. Such a charge or imputation is actionable as libel only where it has caused special damages to the plaintiff and was made maliciously or in bad faith."); 17 Ruling Case Law, 300 ("A mere statement that the defendant wants the plaintiff to pay his honest debts, uttered in the presence of the plaintiff, has been held not slanderous, on the

19-14434                Tjoflat, J., Dissenting                13

Finally, trying to apply the third element, whether the matter is of legitimate public concern, is nonsensical because the public does not know anything about Hunstein's debt.  Only the mail vendor has been given access to Hunstein's information, and Hunstein's debt and the circumstances surrounding it could be of legitimate concern to the mail vendor, who must comply with the FDCPA's notification requirements to debtors.[8]   The sheer

---

ground that such a charge imputes no dishonorable conduct to the plaintiff."); *id.* at 299 ("A writing containing the mere statement that a person . . . owes a debt and refuses to pay . . . does not in a legal sense necessarily expose the person of whom it is said to public hatred, contempt, or ridicule, nor does it degrade him in society, lessen him in public esteem, or lower him in the confidence of the community.").

[8] For instance, under the FDCPA, the debt collector must let the consumer know that he or she can dispute the validity of the debt and must also "provide the consumer with the name and address of the original creditor, if different from the current creditor." 15 U.S.C. § 1692g(a)(5).  This kind of information may naturally include circumstances surrounding the debt.  There are countless kinds of debt, and the flow of specific information about the particular kind of debt between a debtor and debt collector is anticipated.  *Cf. Reese v. Ellis, Painter, Ratterree & Adams,* LLP, 678 F.3d 1211 (11th Cir. 2012) (foreclosure notifications as debt communication); *Eades v. Kennedy, PC Law Offs.*, 799 F.3d 161 (2d Cir. 2015) (nursing home debt communications).  If the Court's position is that there would not be standing in this case if the mail vending process were in-house, that is, within the debt collector's business, that is elevating form over substance.  The debt collector has presumably chosen to use a mail vendor as a cost-saving measure due to the mail vendor's dealing in high volume, and requiring a debt collector to do everything in house would likely raise costs that would ultimately be passed to consumers.  And, ironically, mail vendors actually enhance compliance with statutory requirements.  Brief for The National Creditors Bar Association as Amicus

14                    Tjoflat, J., Dissenting                    19-14434

difficulty of trying to apply the third element should signal to the Court that there is no fit between the public disclosure of private facts and Hunstein's alleged statutory violation.

The Court cites with approval *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020), for the proposition that the common-law harm and the statutory violation need to be of the same kind but not necessarily of the same degree. Majority Op. at 13. Leave aside the fact that *Gadelhak* specifically explained that it saw standing in that case differently from how the Eleventh Circuit did in *Salcedo v. Hanna*, 936 F.3d 1162, 1172 (11th Cir. 2019). The statutory violation in *Gadelhak* was that the plaintiff had received five unwanted text messages from AT&T. The common-law ana-logue to this statutory violation, then-Judge Barrett explained, was intrusion upon seclusion. Then-Judge Barrett explained that un-wanted telephone calls had long been deemed to qualify for the tort of intrusion upon seclusion. *Gadelhak*, 950 F.3d at 462. So,

---

Curiae Supporting Defendant-Appellee at 3, Hunstein v. Preferred Collection & Mgmt. Servs., Inc., No. 19-14434, ECF No. 134 (explaining that mail ven-dors, voice analytics vendors, and cloud vendors all provide their services to-ward the goal of promoting adherence to FDCPA statutory requirements). "Letter vendors ensure that the compliance decisions of management are im-plemented and protected through mechanisms that guarantee accurate deliv-ery of content and prevent alteration of, or interference with otherwise-com-pliant letters." *Id.*

19-14434                  Tjoflat, J., Dissenting                  15

she considered unwanted text messages to be simply the latest form of intrusion upon seclusion.[9]  *See id.*

   That analysis is a far cry from what the Court has done here today.  The Court has admitted that a key element of public disclosure of private facts is missing in Hunstein's claim—namely, that the disclosure must be public.  But, the Court says, that is a difference in degree and not in kind, so the common-law analogue still stands.  Majority Op. at 19–20.  That is wrong.  Even in *Salcedo*, where the match between the statutory violation and common-law harm was closer than in this case, that is, the tort was closer in kind, we ultimately rejected the proposition that the analogy between repeated unwanted phone calls, which was an established example of intrusion upon seclusion, and an unwanted text message was close enough to find a common-law analogue.  *Salcedo*, 936 F.3d at 1171 (explaining that an unwanted text message "f[e]ll short of

_____

[9] The Court also cites *Lupia* in support of its standing analysis.  Majority Op. at 15–16 (citing *Lupia v. Medicredit, Inc.*, 8 F.4th 1184 (10th Cir. 2021), as a recent case in the wake of *TransUnion*).  *Lupia* was a case under a different provision of the FDCPA where the plaintiff received an unwanted phone call and voicemail in violation of the statute, and the court there held that the plaintiff had standing because the unwanted phone call was analogous to the tort of intrusion upon seclusion.  8 F.4th at 1191.  Again, unwanted phone calls have been a prototypical example of the tort of intrusion upon seclusion, so there is little trouble in finding a common-law analogue in that case.  *See id.* at 1191–92.  But what the Court's opinion does here today is the equivalent of saying that the tort of intrusion upon seclusion would apply, even if an individual's seclusion was not intruded upon.  It cannot be.

16                 Tjoflat, J., Dissenting                 19-14434

th[e] degree of harm" that intrusion upon seclusion requires).[10]
Whether looking at kind or degree of harm, we cannot now find a
common-law analogue to the public disclosure of private facts be-
cause the violation Hunstein alleges is indeed not even public.  To
do otherwise defies logic.

### B. Judgment of Congress

But, even if we adopted the Court's distant-relative test and
held that Hunstein's alleged statutory violation is analogous to the
public disclosure of private facts, Congress seemed to explicitly en-
vision the role of intermediaries, like mail vendors, in the statutory
scheme.  In the context of the FDCPA, not all transmissions to third
parties are suspect.  The party to whom Hunstein's personal infor-
mation was sent is no stranger.  It is the entity responsible for mail-
ing out letters on behalf of Preferred.  We can look to 15 U.S.C. §
1692b and 15 U.S.C. § 1692f, other provisions of the FDCPA, for

––––––––––––––––––

[10] The Court wrongly minimizes *Salcedo's* analysis of *both* the kind and the
degree of harm.  For sure, we emphasized in Salcedo that "we [we]re not at-
tempting to measure how small or large Salcedo's alleged injury [wa]s."  936
F.3d at 1172.  But we also repeatedly explained that looking at both the kind
and the degree of harm informed our analysis.  *See id.* at 1171 ("Salcedo's alle-
gations fall short of this degree of harm."); *Id.* ("We find [these torts] also to
be distinct both in kind and in degree."); *Id.* at 1172 ("[A]lthough Salcedo's
allegations here bear a passing resemblance to this kind of historical harm, they
differ so significantly in degree as to undermine his position."); *Id.* ("An
examination of those torts reveals significant differences in the kind and degree
of harm they contemplate redress for.").

19-14434                 Tjoflat, J., Dissenting                17

confirmation that Congress meant to exempt transmission services from the general prohibition on third-party communications.

These statutes impose restrictions, for instance, on the use of telegrams when debt collectors contact debtors.  This set of restrictions presupposes that debt collectors could use telegrams, even though that means the contents of the telegram would be transmitted through a telegram operator.  Congress did not have a problem with that intermediary.  In fact, it built rules around that system, as codified in § 1692b and § 1692f.

At a basic level, Congress's acquiescence in the use of intermediaries makes sense, because when individuals incur debt they are at least impliedly, and usually expressly, consenting to receive information about their debts from their creditor.  We need look no further than the FDCPA itself for proof that Congress factored in this kind of consent into the statutory scheme.  Take, for instance, § 1692g.  It says that "[w]ithin five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall . . . send the consumer a written notice containing" things like the amount of the debt, the name of the creditor, and the option of contesting the validity of the debt.  15 U.S.C. § 1692g(a).  Congress imposed an affirmative duty on debt collectors to write debtors with information about their debt because this practice *benefits* debtors, giving them notice of their rights and obligations under the law.  And Congress seemingly assumed debtors should receive these kinds of notices in the context of the broader world of debt collection and the relationship

18                    Tjoflat, J., Dissenting                    19-14434

between a debt collector and debtor.  It seems odd that Congress would hamper the very process it codifies in § 1692g, writing debtors about their debt, by banning the use of mail vendors, who simply send out the written notices about debt, under the language of § 1692c(b).

I am certainly not saying that debtors consent to abusive practices, at which the FDCPA was aimed.  But simple transmission of information along a chain that involves one extra link because a company uses a mail vendor to send out the letters about debt is not a harm at which Congress was aiming.  *Cf. White v. Goodman*, 200 F.3d 1016, 1019 (7th Cir. 2000) ("'The Fair Debt Collection Practices Act is not aimed at . . . companies that perform ministerial duties for debt collectors, such as stuffing and printing the debt collector's letters.").  Thus, Congress's judgment goes against finding standing for Hunstein, when CompuMail simply served as an intermediary to communication between debt collector Preferred and debtor Hunstein, like a telegram operator.[11]  I

―――――――――――――――

[11] The Court reduces Congress's express contemplation of telegram usage to "passing references to an all-but-obsolete technology, which appear in different portions of the FDCPA."  Majority Op. at 31 n.10.  The Court says that evaluating the use of intermediaries within the statutory scheme in the way I suggest is attempting to "override § 1692c(b)'s plain language."  *Id.*  Not so.  *Spokeo*'s test for intangible harms expressly contemplates looking to the judgment of Congress in determining whether a statutory violation creates standing.  My point in bringing up telegrams is not to revive obsolete technology but rather to demonstrate that Congress planned for debt collection notifications to go through third parties to get to the debtor.  After all, a telegram necessarily required an operator who received a debt collection notice from

19-14434                    Tjoflat, J., Dissenting                    19

emphasize again that Congress did not mean to eliminate debt collection. It meant to eliminate abusive debt collection practices, and Congress plainly did not think the use of intermediaries was an abusive debt collection practice.

The Court's opinion plays the trick of defining very broadly the judgment of Congress. The Court looks to the FDCPA's general purposes in § 1692(a), in which Congress explained that "invasion[] of individual privacy" as a harm the statute was mean to address. Majority Op. at 30. But the Court never addresses whether Congress thought mail vendors were a culprit of the "invasions of privacy." Some of the specific abuses Congress meant to target were "obscene or profane language, threats of violence, telephone calls at unreasonable hours, misrepresentation of a consumer's legal rights, disclosing a consumer's personal affairs to friends, neighbors, or an employer, obtaining information about a consumer

-------

the debt collector and then transmitted that notice to the debtor. A plaintiff could allege that the debt collection company communicated personal information to the employees of a telegram company and attempt to base standing on that "communication." That basis of standing would obviously be rejected because Congress contemplated the fact that telegrams would be used to allow debtors to receive information about their debts. The Court has yet to explain how a mail vending company is any different from a telegram company, and Congress expressly condoned the latter. Of course, we need not look to the judgment of Congress to determine that standing does not exist in this case, because there is no common-law analogue to mail vending employees receiving personal information for the purpose of sending debt collection notices. I simply mean to highlight the fact that neither of *Spokeo*'s considerations support the Court's view here.

20                        Tjoflat, J., Dissenting                        19-14434

through false pretense, impersonating public officials and attor-
neys, and simulating legal process."[12]   S. Rep. No. 95-382, at 2
(1977), *reprinted in* 1977 U.S.C.C.A.N. 1695, 1696.  But there is no
evidence that Congress was trying to eliminate mail vendors.[13]
The Court cannot look to Congress's general purposes in § 1692(a)
about protecting privacy to support its intangible harm theory be-
cause the general purposes of Congress tell us nothing about what
Congress thought about mail vendors.   *Cf. Salcedo*, 936 F.3d at
1168–69 ("We first note what Congress has said in the TCPA's

---

[12] The Court says that it will privilege the "duly enacted statute's text—which
tells us that Congress was aimed at preventing 'invasions of individual pri-
vacy,'" over "legislative history."  Majority Op. at 30 n.10.  By looking at gen-
eral purposes in § 1692(a), the Court is doing the exact same thing it accuses
me of doing—looking beyond § 1692c(b) at other parts of the statutory scheme
to discern Congress's overall purpose.  The problem for the Court's position
is that the general purposes of § 1692(a) tell us nothing about what Congress
thought about mail vendors, while the statutory provisions about telegrams
in § 1692g give us a clear picture about what Congress thought about third
parties receiving information from debt collectors, which the third parties then
give to the debtors.

[13] If Congress had been trying to eliminate mail vendors, it certainly has not
been clear to the Bureau of Consumer Financial Protection ("CFPB").  The
CFPB, which has authority to issue rules under the authority of the FDCPA,
just issued new rules, which expressly contemplate the use of mail vendors in
debt collection.  85 Fed. Reg. 76734, 76738 (Nov. 30, 2020) (to be codified at 12
C.F.R. § 1006), 86 Fed. Reg. 5766, 5845 n.446 (Jan. 19, 2021) (to be codified at
12 C.F.R. § 1006) ("In the Operations Study, over 85 percent of debt collectors
surveyed by the Bureau reported using letter vendors.").  These rules become
effective November 30, 2021.

19-14434              Tjoflat, J., Dissenting              21

provisions and finding about harms from telemarketing via text message generally: *nothing*." (emphasis in original)).

### III.

Finally, a word about damages.  The Court's opinion acknowledges *Trichell*'s observation that when an individual's rights are violated under the FDCPA, that individual is entitled to recover "any actual damage sustained."  Majority Op. at 31 (citing *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1000 (11th Cir. 2020) and its explanation of § 1692k(a), the damages provision under the FDCPA).  But, for inexplicable reasons, the Court tries to limit that holding to § 1692e, the specific statutory provision of the FDCPA at issue in *Trichell*.  *Trichell*'s reasoning was not so narrow because the damages provision applies to all causes of action contained within the FDCPA.  *Trichell* reasons that the statute's language about "additional damages" an individual may recover on top of "actual damages" "suggests that Congress viewed statutory damages [under the FDCPA] not as an independent font of standing for plaintiffs without traditional injuries, but as an 'additional' remedy for plaintiffs suffering 'actual damage' caused by a statutory violation." *Trichell*, 964 F.3d at 1000.  The Court's opinion does nothing to engage with *Trichell*'s reasoning related to § 1692k(a).  It does not because it cannot.  The statute's presumption that there would be actual damages further enforces my view that Congress did not intend for a statutory violation under § 1692c(b) to create standing.

What the Court's opinion is telling us is that we should pre-
sume harm if a defendant violates § 1692c(b).  But it does not ap-
pear that Congress intended for us to do that.  And for good reason.
Traditionally, courts create presumptions when the other side has
all the evidence.[14]  But, in this case, the plaintiff has all the evidence
of the harm it caused him.  So, it makes no sense to presume that
he was harmed for Article III purposes because he alone knows
how he was harmed.  And, based on his pleadings, Hunstein suf-
fered no additional harm beyond the statutory violation.  Because
the harm Hunstein has alleged cannot create standing and because
he has alleged no other harm,[15] in my view, this case was properly
dismissed.

---

[14] Res ipsa loquitur is an example of where we create a presumption based on
one party's possession of the evidence.  *See Cie. Des. Messageries Maritimes
v. Tawes*, 205 F.2d 5, 8 (5th Cir. 1953).

[15] I am sorry to rain on the Court's parade of horribles about the billboard in
Times Square, but that example sets fire to a straw man.  If Preferred had plas-
tered Hunstein's private medical- and debt-related information on a billboard
in Times Square, Hunstein would have a slam-dunk state tort case.  And, even
if he decided to sue under the FDCPA, his standing would likely be based on
a tangible harm or material-risk-of-harm theory because of the danger of iden-
tity theft or other concerns associated with airing information so *publicly*, in
stark contrast to a mail vendor receiving information for the purposes of in-
forming the debtor *alone* of his debt in compliance with Congress's mandates.
And I think it would be quite rare indeed that a debt collection company
broadcast an individual's private information and no actual damages could be
proven.

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

October 28, 2021

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  19-14434-HH
Case Style:  Richard Hunstein v. Preferred Collection
District Court Docket No:  8:19-cv-00983-TPB-TGW

**This Court requires all counsel to file documents electronically using the Electronic Case
Files ("ECF") system, unless exempted for good cause. Non-incarcerated pro se parties
are permitted to use the ECF system by registering for an account at www.pacer.gov.
Information and training materials related to electronic filing, are available at
www.ca11.uscourts.gov.** Enclosed is a copy of the court's decision filed today in this appeal.
Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a
later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for
filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise
provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is
timely only if received in the clerk's office within the time specified in the rules. Costs are
governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for
attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested
Persons a complete list of all persons and entities listed on all certificates previously filed by
any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be
reheard must be included in any petition for rehearing or petition for rehearing en banc. See
11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming
compensation for time spent on the appeal no later than 60 days after either issuance of mandate
or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via
the eVoucher system. Please contact the CJA Team at (404) 335-6167 or
cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher
system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellee.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Christopher Bergquist, HH at 404-335-6169.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs